UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JEFFREY PIPKIN,

         Plaintiff,

   v.

NANCY A. BERRYHILL,

         Defendant.

Case No.17-cv-02657-EDL

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND REMANDING FOR FURTHER PROCEEDINGS**

Re: Dkt. Nos. 13, 15

Plaintiff Jeffrey Pipkin filed this lawsuit pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Commissioner of Social Security's decision to deny his application for supplemental security income under Title XVI of the Social Security Act. Before the Court are the parties' cross-motions for summary judgment. For the following reasons, the Court GRANTS Plaintiff's motion for summary judgment, DENIES Defendant's motion for summary judgment, and REMANDS for further proceedings.

## I. BACKGROUND

Plaintiff was thirty-eight years old at the time of his alleged disability onset on January 15, 2004. AR 94-95. He was forty-nine years old at the time of his application. AR 44. He completed tenth grade and received special education services through junior high school. AR 73, 272. At the time of his application for disability benefits, Plaintiff claimed a disability based on osteoarthritis in the knees, chronic obstructive pulmonary disease ("COPD"), low back pain, obstructive sleep apnea, cervicalgia, morbid obesity, primary localized osteoarthrosis (lower leg), closed fracture of navicular scaphoid bone of wrist, carpal tunnel syndrome, and osteoarthrosis. AR 94-95. Plaintiff previously worked in construction as a builder and electrician's assistant. AR 74-75, 269.

A.    **Procedural History**

On July 24, 2014, Plaintiff applied for disability benefits under Title XVI, alleging a disability onset date of January 15, 2004.[1] AR 227-45. His application was initially denied on October 20, 2014, and upon reconsideration on February 6, 2015. AR 163-68, 169-75. Plaintiff requested a hearing, and the administrative law judge ("ALJ") held a hearing on November 23, 2015. AR 52-93. The ALJ rendered an unfavorable decision on January 28, 2016. AR 26-45. On July 14, 2016, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. AR 16-18. Upon request and a finding that it did not receive additional information before it made its earlier decision, the Appeals Council set aside its July 14, 2016 decision and reconsidered Plaintiff's request to review the ALJ's decision. AR 8-9. Upon reconsideration, the Appeals Council once again denied Plaintiff's request for review of the ALJ's decision in a notice dated March 21, 2017. AR 1-6. On that date, the ALJ's decision became final. Plaintiff then filed this lawsuit on May 8, 2017.

B.    **Plaintiff's Medical History**

1.    **Santa Clara Valley Health and Hospital System (treating physicians and nurse practitioners)**

Plaintiff began seeing doctors at Santa Clara Valley Health and Hospital System for treatment as early as 2008. AR 395-444, 469-86, 488-555, 557-667, 678-96. He generally sought treatment for hypertension, sleep apnea, pain in his neck, back, and knees, and injuries he sustained to his wrist and ankle.

Plaintiff received a consultation from nurse practitioner Yuyan Han at the Santa Clara Valley Health & Hospital System Pulmonary/Sleep Medicine Clinic on August 6, 2010. AR 557-59. She found that he had symptoms of severe obstructive sleep apnea. AR 558. Plaintiff indicated a willingness to use a CPAP machine and he was referred for a sleep study. AR 558-59. A later sleep study on February 23, 2011 showed that Plaintiff had severe obstructive sleep apnea and he was prescribed a CPAP machine. AR 600.

---

[1] Originally, Plaintiff also applied for disability insurance benefits under Title VII of the Social Security Act. That application was also denied initially and upon rehearing. Prior to the ALJ's hearing, Plaintiff withdrew that application because he did not have treatment records that could prove his disability before his date last insured. AR 368.

2

During his visit on November 13, 2010, he saw Christopher Gunasekera, M.D., for an appointment about left knee pain that had been gradually increasing for three months. AR 436-38. Dr. Gunasekera's notes state that Plaintiff was experiencing a dull and sharp pain with a severity level of 7 that was aggravated by bending, climbing and descending stairs, lifting, movement, and walking. AR 436. He obtained pain relief with medications. AR 436. X-rays were taken, he was referred to the arthritis clinic, and he was prescribed relafen and vicodin for his pain. AR 438.

During a later visit to Timothy Ong, M.D., on January 23, 2013, Plaintiff presented with complaints of hypertension. AR 400-05. Dr. Ong's notes reflect treatment during this visit for hypertension, osteoarthritis of the knees, lower back pain, cervical pain, a closed fracture in his wrist, and morbid obesity. AR 400. With respect to the knee pain, Dr. Ong noted that Plaintiff sustained injuries since high school that were never treated and has obtained good relief from the pain with injections. AR 400. Plaintiff was previously given steroid injections for his knee pain in 2010 and 2011 by Thomas M. Bush, M.D. AR 594-97, 601-03, 605-08.

Plaintiff visited Dr. Ong again on October 16, 2013 for hypertension and pain in his neck, back, and knees. AR 385-90. Dr. Ong diagnosed him with hypertension, sleep apnea, morbid obesity, and osteoarthrosis of the knees. AR 385. Plaintiff was advised to stop smoking, obtain X-rays of his neck, back, and knees, and continue his pain and blood pressure medications with some adjustment. AR 388. X-rays of his left knee showed moderate degenerative changes and X-rays of his right knee showed moderate to severe tricompartmental osteoarthritis. AR 398-99. X-rays of his back showed degenerative lipping anteriorly over lumbar and lower thoracic spine, as well as degenerative changes of facet joints, vascular calcification, and a suggestion of possible vacuum sign at the L4-5 disc level consistent with degenerative change at that level. AR 397. Plaintiff had a follow up visit with Dr. Ong on June 18, 2014 for sleep apnea and knee pain, during which he was referred to an arthritis clinic and to a pulmonary specialist for re-evaluation and a new CPAP machine. AR 390-94.

On October 20, 2014, Plaintiff visited the hospital's rheumatology clinic for an initial consultation. AR 470-75. During this visit, Plaintiff saw nurse practitioner Deanna Yamamoto. In the examination, she found that his joints were normal except for tenderness in his knees. AR

473-74. She referred him for physical therapy after Plaintiff stated that he was not interested in having steroid injections. AR 474.

Plaintiff began seeing Nancy Cuan, M.D., on October 29, 2014, when he visited her with complaints of back pain, which he reported as worsening. AR 475-81. At that initial appointment, Dr. Cuan assessed him for low back pain, hypertension, tobacco use, and osteoarthrosis in the knees. AR 475. For his back pain, Dr. Cuan increased his prescription for Percocet, which Plaintiff had found somewhat helpful in the past, and discontinued his prescription for Narco, which he had not found helpful. AR 475. She also provided a refill of Nabumetone for his knee pain as he found that it "work[ed] really well." AR 475. Her examination notes state that he had negative straight leg raises bilaterally and a right lower lumbar paraspinous muscle with mild tenderness. AR 478.

He returned for a visit with Nima Soltanzad, M.D., on July 7, 2015, complaining of back pain and shortness of breath. AR 495, 498. He explained to Dr. Soltanzad that he had not been taking several of his medications (specifically, fosinopril for hypertension and spiriva for COPD) for the prior three to four weeks because he is only able to visit the pharmacy once a month. AR 495. Dr. Soltanzad's treatment notes state that Plaintiff had moderate to severe creptius in both knees, although it was worse in the right knee. AR 498.

Images of Plaintiff's knees were reviewed by Keith Fraker, M.D. on January 4, 2016. AR 698. For the right knee, he noted marked degenerative change of the medial compartment and laterally. AR 698. He reported that there was slight subluxation and loose bodies were suggested. AR 698. For the left knee, Dr. Fraker also noted marked degenerative changes, especially involving the medial compartment but some laterally as well. AR 698. He also noted slight subluxation and possibly loose bodies. AR 698. He stated that the degenerative change of the anterior compartment was better seen on the earlier images from October 16, 2013. AR 698.

### 2. Nancy Cuan, M.D. (treating physician)

In addition to her clinical notes that were part of the overall medical records Plaintiff obtained from Santa Clara Valley Health & Hospital System, Dr. Cuan also provided separate evaluations about the extent of Plaintiff's impairments and the effect of those impairments on his

1   ability to perform work.

2   On October 28, 2014, Dr. Cuan completed a request for medical information form for

3   California's General Assistance program.  AR 669.  She opined that Plaintiff is permanently

4   disabled and unable to work as a result of his cervicalgia, osteoarthiritis of the knee, chronic low

5   back pain, and carpal tunnel.  AR 669.  She further opined that his disability is expected to last

6   more than twelve months, it significantly restricts his activities of daily living, and he is incapable

7   of tolerating low stress jobs.  AR 669.  She also wrote a short letter on October 30, 2014, on

8   Plaintiff's behalf confirming that he has multiple medical problems, including chronic back and

9   neck pain, osteoarthritis of the knees, and carpal tunnel, which render him disabled.  AR 671.

10   On November 6, 2015, Dr. Cuan completed a more thorough physical residual functional

11   capacity ("RFC") questionnaire for Plaintiff based on her treatment of Plaintiff since October 28,

12   2014.  AR 673-76.  She identified his diagnoses as chronic neck, low back, and knee pain, COPD,

13   carpal tunnel syndrome, obstructive sleep apnea, and diabetes.  AR 673.  She opined that his

14   anxiety contributes to the severity of his symptoms and functional limitations.  AR 673.  She

15   explained that he is incapable of even low stress jobs because his pain affects his mood, and his

16   pain and other symptoms are severe enough to frequently interfere with his attention and

17   concentration that are needed to perform even simple work tasks.  AR 673.  She opined that he can

18   sit or stand for thirty minutes at a time and stand or walk less than two hours in an eight hour work

19   day and sit about two hours in an eight hour work day.  AR 674.  She also opined that he needs a

20   job that permits shifting positions at will from sitting, standing, or walking.  AR 674.  She stated

21   that he would need to take five to six unscheduled breaks a day of about thirty minutes each.  AR

22   674.  She also expected that he would be absent from work as a result of his impairments for more

23   than four days a month.  AR 675.

24   As part of her RFC assessment, Dr. Cuan also opined that he would have the following

25   additional limitations: lift ten pounds occasionally and twenty pounds rarely; never look down,

26   rarely turn his head left or right, occasionally look up, and frequently hold his head in a static

27   position; rarely twist or climb stairs; never stoop crouch, squat, or climb ladders; only handle

28   objects for two percent of an eight hour day bilaterally; only perform fine manipulations bilaterally

for two percent of an eight hour day; and only perform reaching maneuvers bilaterally for twenty percent of an eight hour day.  AR 675.

### 3.    Clark E. Gable, M.D. (examining physician)

Plaintiff saw Clark E. Gable, M.D., for a consultative medical examination on October 13, 2014.  AR 458-60.  Plaintiff reported his chief complaints as lower back pain, problems with his arms including multiple fractures, sleep apnea, arthritic knees, high blood pressure, carpal tunnel, morbid obesity, and generalized problems with his ankles.  AR 458.

Dr. Gable noted that Plaintiff is morbidly obese and was a heavy smoker until he stopped smoking recently.  AR 458.  His report stated that Plaintiff has arthritis in both knees as well as crepitus that is more prominent on the right than left knee.  AR 458.  Dr. Gable noted that the arthritis slows his walking quite a bit and impacts his squatting.  AR 458.  He reported that Plaintiff has a deformity of the right ankle from a fracture that was treated with hardware, which cases an antalgic gait.  AR 458.  However, he noted that Plaintiff does not use an ambulatory device.  AR 458.  Dr. Gable also examined X-ray reports that showed lipping over the lumbar lower thoracic spine, some degenerative changes of facet joints and the L4-5 disc level consistent with degenerative changes.  AR 458.  He also noted that Plaintiff has X-rays that show moderate arthritis of both knees, as well as disc disease in his neck.  AR 458.  Dr. Gable stated that multiple pain medications have given Plaintiff moderate relief.  AR 458.  Finally, Dr. Gable noted that Plaintiff had carpal tunnel with pain and numbness bilaterally from his elbows down, as well as obstructive sleep apnea and hypertension.  AR 458.

During the examination, Dr. Gable found that Plaintiff was in no acute distress, walked with a mild antalgic gait because of his right ankle deformity, and was able to lie down, sit up, and get on and off the examination table despite his weight.  AR 459.  Plaintiff could not bend his knees below ninety degrees and he was tender over the medial and lateral joint spaces.  AR 459.  His straight leg raising was negative to about forty degrees and he could flex normally on the left and zero to thirty on the right.  AR 459.  He could make a modest squat and there was no significant spasm or tenderness.  AR 459.  He showed no musculoskeletal atrophy, and his range of motion about the neck, shoulders, elbows, and wrists were normal.  AR 459.

Dr. Gable formed the following diagnostic impression: (1) low back pain with no evidence of radiculopathy; (2) deformed right ankle which causes problems including a mild limp from hardware in an old fracture; (3) arthritis in both knees with decreased range of motion; (4) carpal tunnel with a negative Tinel's sign; (5) morbid obesity that has been stable for years; (6) alleged COPD which was not clinically significant and is much relieved through the use of three inhalers; and (6) hypertension that appears to be under good control. AR 459-60. Based on his findings, he concluded that Plaintiff can sit up to six hours a day with usual breaks, stand and/or walk up to six hours a day on level ground and without an ambulatory device, lift twenty-five pounds frequently and fifty pounds occasionally, without any limitation to fine finger and hand manipulations. AR 460.

### 4. Paula Chaffee, Ph.D. (examining neuropsychologist)

Paula Chaffee, Ph.D., evaluated Plaintiff on August 6, 2014 for a neuropsychological assessment. AR 447-55. Dr. Chaffee noted that Plaintiff took the bus to his appointment and arrived on time. AR 447. She stated that he was dirty and malodorous when he met with his social worker, but his hygiene was better at their appointment. AR 447. She observed that his affect was labile and he was hyperverbal, but she did not note any unusual mannerisms. AR 447. Plaintiff's main complaint was that he was moody and depressed. AR 447. She noted at several points in her report that Plaintiff's stories were hard to follow, explaining that his speech was "tangential and circumstantial" and "difficult to reign in." AR 448.

Dr. Chaffee noted Plaintiff's extended history of alcohol and drug abuse, including the use of methamphetamine, cocaine, and marijuana. AR 448. After a period of incarceration in county jail, he reported that he became sober, but, as a result, was more emotional and started to experience episodes of crying for the first time. AR 448. Plaintiff stated that he believes his long-term drug use negatively affected his mood. AR 449. During his appointment with Dr. Chaffee, Plaintiff cried at times while he was speaking. AR 448. He also reported feeling insecure, angry, and suicidal. AR 449. However, in spite of these emotional changes, Dr. Chaffee noted that Plaintiff never sought psychiatric treatment and has not been hospitalized for psychiatric issues. AR 448.

She described Plaintiff as being independent in all areas of daily functioning. AR 449. Although he is chronically homeless, she noted that he takes marginal care of his personal hygiene, dresses himself, watches television, and prepares simple meals. AR 449. He also self-administers his medications. AR 449. He had been prescribed pain medications, but explained to Dr. Chaffee that he does not often take his pain pills because although he is pain he fears the medications could damage his liver. AR 449.

During the examination, Dr. Chaffee performed a mental status exam on Plaintiff. She noted his labile effect that often turned tearful and that his mood was depressed. AR 451. Plaintiff was alert and oriented. AR 451. With respect to attention and concentration, he was able to repeat four digits forward and three digits backward. AR 451. He was distracted by his own speech, and he was somewhat able to attend to the interview with frequent interruptions and redirections. AR 451. He often interrupted the testing to talk, even when he was instructed not to interrupt. AR 451. His thoughts were tangential, circumstantial, and concrete with no overt delusions. AR 451. Although he reported suicidal ideation, he denied plan and intent and denied homicidal ideation. AR 451. His memory was grossly intact, and he was able to recall autobiographical and historical information but was a poor historian for dates. AR 451. She noted impaired insight and poor judgment. AR 451. His gait was impaired and labored due to postsurgical pain in his ankle, arthritis in his knees, and morbid obesity. AR 451.

Based on his overall psychological functioning, Dr. Chaffee diagnosed Plaintiff with bipolar disorder and severe depression. AR 452. She calculated Plaintiff's full-scale I.Q. score as 87, which is consistent with low average to average intelligence. AR 452. She reported that an informal assessment of his writing revealed spelling errors and phonological processing errors that were consistent with dyslexia. AR 453. She also diagnosed Plaintiff with polysubstance dependence in full sustained remission. AR 453.

Dr. Chaffee offered the following assessment of Plaintiff's impairments to his ability to work. AR 454. She found that he is severely impaired in his ability to maintain emotional stability and predictability. AR 454. She concluded that he was markedly impaired in his ability to maintain adequate attention and concentration, adapt to changes in job routine and perform

8

consistently, maintain regular attendance in the workplace, and communicate effectively. AR 454. She noted moderate impairments in his ability to follow and remember complex or detailed instructions, maintain adequate pace and persistence to perform one- or two-step simple repetitive tasks, withstand the stress of a routine work day, and interact appropriately with coworkers and the public. AR 454. She found that he had no impairment in his ability to follow and remember simple instructions, perform work activities without special instruction or supervision, and accept instructions from supervisors. AR 454.

C. **ALJ Hearing**

1. **Plaintiff's Testimony**

During Plaintiff's testimony at the hearing with the ALJ, he explained that he has not worked in any capacity since 2004 and he has not been able to work during that time. AR 57-59. He previously worked as an electrician's assistant for a construction company from 2000 to 2004, and he learned to be an electrician from on-the-job training rather than a formal training program or apprenticeship. AR 74. Before that, he was a builder for a construction company, focusing on framing buildings. AR 75.

In response to a question about how he supports himself, Plaintiff stated that he has been homeless and stayed with a friend when possible, and that he receives general assistance and food stamp benefits. AR 59. He noted that he had a history of smoking, but stopped six months before the hearing, and he also had a history of drug and alcohol abuse but has been sober for over ten years. AR 57-58, 60.

Plaintiff testified that he has long had a weight problem. He is 5'8" and weighs 365 pounds. AR 76. He recently lost twenty pounds after being diagnosed with diabetes. AR 60-61. Although his doctors have long recommended that he lose weight, he was only able to do so more recently after his diabetes diagnosis forced him to stop eating sugar-laden foods. AR 61. He testified that he has not been able to exercise to lose weight because of his physical condition. AR 62-63.

With respect to his diabetes, Plaintiff testified that he experiences numbness in his feet, toes, and hands. AR 78. He also described how he broke his right arm four times, which required

surgery in which pins and screws were inserted.  AR 78-79.  He also had surgery on his left arm.

AR 79.  Plaintiff also testified to experiencing pain in his lower back and sciatica that prevents

him from sleeping well.  AR 80.

He testified that he has experienced pain in his knees and seen an arthritis specialist, who

explained that his right knee is "bone on bone."  AR 76.  The ALJ asked Plaintiff why he had not

taken his physician's recommendation for steroid injections to help control the pain in his knees.

AR 64.  He explained that he had previously received steroid injections and, although they

provided pain relief, they had undesirable side effects.  AR 64-65.  He testified that his current

doctor would not refer him to physical therapy for his knee pain.  AR 77.  He also testified about

the side effects he experiences from his mediations.  For example, he explained that Percocet

makes him drowsy and moody and the Nembutal "wear[s] on [his] patience."  AR 82.

Plaintiff uses a cane to help him walk, although he has not been prescribed the use of a

cane by a physician.  AR 65.  He also wears prescribed braces on his hands for carpal tunnel

syndrome and a brace on his knee.  AR 65.

The ALJ questioned Plaintiff about his efforts to obtain counseling for psychological

issues.  AR 66.  Plaintiff testified that he is depressed and he has tried to schedule counseling

appointments without success.  AR 66-67.

Plaintiff also testified about his activities of daily living.  When he is living with someone,

he wakes up around 7 a.m., makes a meal in the microwave, and then sits in the front of the house,

reads a book, listens to music, or watches television.  AR 68-69.  He does not leave the house

during the day.  AR 71.  He testified that he does not maintain an active social life, as he explained

that he does not consider other homeless individuals to be particularly social.  AR 72.  When he

needs to keep an appointment or travel across town for any reason, he depends on public

transportation.  AR 72-73.

In order to purchase groceries, he takes the bus to the grocery store and will complete his

grocery shopping from the motorized chairs that are available at the store.  AR 69.  A friend

allows Plaintiff to store his food at his house, as well as a CPAP machine he uses to treat his sleep

apnea.  AR 69-70, 80.

### 2. Vocational Expert's Testimony

Ronald Morrell testified as a vocational expert at the November 23, 2015 hearing. Mr. Morrell identified Plaintiff's past work as falling within three DOT job codes: (1) carpenter, DOT listing 860.381-022, medium work and SVP 7; (2) electrician, DOT listing 824.261-010, medium work and SVP 7; and (3) semi-skilled construction worker, DOT listing 869.664-014, heavy work and SVP 4. AR 84-85. He noted that Plaintiff's work history form describes all of these jobs at the heavy exertional level. AR 85.

The ALJ posed a hypothetical to Mr. Morrell. He asked him to assume a hypothetical individual of the same age, work experience, and education level as Plaintiff. AR 85. The hypothetical individual had the following limitations: (1) lift up to 10 pounds frequently and 20 pounds occasionally; (2) stand or walk for up to six hours in an eight hour day; (3) climb stairs or ramps frequently; (4) use ladders or scaffolds; (5) balance, stoop, kneel, or crouch occasionally; (6) use foot controls occasionally; (7) never crawl; (8) never go to unprotected heights; (9) only occasional exposure to pulmonary irritants; (9) only simple, repetitive tasks; and (10) only occasional interaction with coworkers, supervisors, and the public. AR 85-86.

In light of this hypothetical, Mr. Morrell testified that this person could not do Plaintiff's past work. AR 86. However, he testified that this hypothetical person could perform light assembly-related work, including light level production assembler (DOT listing 706.687-010, light work at SVP 2), small products II assembler (DOT listing 739.687-030, light work at SVP 2), and bench assembler (DOT listing 706.684-022, light work at SVP 2). AR 86. He stated that the Department of Labor reports that there are approximately 300,000 jobs for light unskilled assembly work in the economy nationally. AR 86. In addition, Mr. Morrell testified that Plaintiff could perform work as a parking lot attendant (DOT listing 915.473-010, light work at SVP 2) that has 125,000 positions nationally and a cashier II (DOT listing 211.462-010, light work at SVP 2) that has 500,000 positions nationally at that exertional level. AR 87.

In the second hypothetical, the ALJ asked Mr. Morrell to consider the same hypothetical persons discussed above with the following additional limitations: (1) no exposure to pulmonary irritants; (2) and no contact with the public. AR 87. With these additional limitations, Mr.

Morrell testified that the hypothetical person could still perform the assembly-related jobs he identified for the first hypothetical person.  AR 87.

Mr. Morrell also answered questions from Plaintiff's representative.  In response to a question about transferrable skills, Mr. Morrell stated that Plaintiff would have no transferrable skills to sedentary work.  AR 88.  Next, the representative asked Mr. Morrell to assume a hypothetical individual who needed to have three unscheduled breaks a day for up to 30 minutes each.  AR 88.  Mr. Morrell testified that this hypothetical person could not perform any work in the economy including Plaintiff's past work.  AR 88.  Similarly, Mr. Morrell testified that a person who needed to be absent from work more than four days a month would not be able to perform any work.  AR 88.  He also testified that a hypothetical person who was markedly impaired in his ability to concentrate and maintain adequate attention and who would be off task more than twenty percent of the work day would not be able to perform any work.  AR 88.  Finally, he testified that a hypothetical person who is markedly limited in adapting to changes in a job routine and in performing work consistently and, therefore, would be off task twenty percent of the work day, would not be employable if he deviated from production standards by twenty percent or more.  AR 89.

### D. ALJ Decision

#### 1. Step One -- Substantial Gainful Activity

At step one, the ALJ determined that Plaintiff has not been engaged in any substantial gainful activity since his application date in 2014.  AR 29.

#### 2. Step Two -- Severe Impairment(s)

The ALJ concluded that Plaintiff has the following severe impairments: obesity, chronic obstructive pulmonary disease, osteoarthritis of the knees, degenerative disc disease of the cervical and lumbar spine, diabetes, and bipolar disorder.  AR 29.

He also found that Plaintiff has several non-severe impairments: obstructive sleep apnea, closed fracture of the navicular scaphoid bone of the wrist, carpal tunnel syndrome, open reduction internal fixation of the left radius fracture, open reduction internal fixation of the right lateral malleolus fracture, gingivitis, hypertension, and polysubstance abuse.  AR 29-30.  The ALJ further

found that Plaintiff's once-diagnosed dyslexia and reading disorder are non-severe impairments. AR 31.

### 3. Step Three -- Listed Impairment(s)

After taking into account the record as a whole, the ALJ determined that Plaintiff's physical conditions do not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 31. The ALJ specifically considered whether the combination of Plaintiff's impairments meets the listings of 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), 3.02 (chronic respiratory disorders), or 9.00 (endocrine disorders), and found that they did not. AR 31. He also considered whether Plaintiff's obesity might itself be equivalent in severity to a listed condition or might elevate the other impairments to listing-level significance, but concluded that his obesity did not result in a listed impairment. AR 31. Finally, the ALJ determined that Plaintiff's mental impairment did not meet or medically equal the criteria of listing 12.04 after considering the paragraph B criteria or the paragraph C criteria. AR 31-33.

### 4. Step Four -- Past Relevant Work and RFC

Considering all of his symptoms, the ALJ concluded that Plaintiff has a residual functional capacity ("RFC") to perform light work with the following limitations: light up to ten pounds frequently and up to twenty pounds occasionally; stand, walk, or sit for up to six hours in an eight hour day; climb stairs or ramps frequently; never use ladders or scaffolds; occasionally balance, stoop, kneel, and crouch; occasionally use foot controls; never crawl, never go to unprotected heights; be exposed to pulmonary irritants occasionally; limited to simple, repetitive tasks; and occasionally interact with coworkers, supervisors, and the public. AR 33.

In reaching this RFC assessment, the ALJ reviewed the evidence from the medical record and discussed the weight he assigned to various medical opinions. He assigned great weight to the opinions of the state agency medical consultants, Dr. Jackson and Dr. Wong. AR 36. Both doctors agreed that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; could stand, walk, and sit for six hours in an eight hour day; could frequently climb ramps and stairs and balance and stoop; could occasionally climb ladders, ropes, or scaffolds; occasionally kneel, crouch, and crawl; and must avoid concentrated exposure to fumes, odors,

United States District Court
Northern District of California

dusts, gases, and poor ventilation. AR 36. In assigning Drs. Jackson and Wong's opinions great weight, the ALJ explained that their findings were based on a thorough review of the medical records, and were consistent with Plaintiff's ability to prepare his own meals, use public transportation to travel, shop in stores, and sleep at friends' houses for shelter. AR 36. Moreover, he noted that Plaintiff's friend, Felicia Webb, completed a third party function report in which she noted that Plaintiff is "always outside." AR 36.

The ALJ also assigned little weight to limitations placed on Plaintiff in 2008 and 2012 after injuries he sustained to his leg and wrist, explaining that limitations to restrict activities and avoid putting weight on the affected limb were only temporary in nature and too remote in time from Plaintiff's application date to be relevant. AR 36-37. He also noted that the limitations in 2008 regarding his leg were precautionary restrictions to help his fracture heal, rather than long-term functional limitations. AR 37.

The ALJ assigned significant weight to the medical opinion and functional assessment of Dr. Gable, the internal medicine consultant who examined Plaintiff on October 13, 2014. AR 37-38. After reviewing the medical record and examining Plaintiff in person, Dr. Gable opined that Plaintiff could sit for up to six hours in a day with usual breaks; he can stand or walk up to six hours a day on level ground and did not need assistance from an ambulatory device; he could lift twenty-five pounds frequently and fifty pounds occasionally; and no manipulative limitations. AR 37-38. In assigning this opinion significant weight, the ALJ stated that the opinion was based on objective medical findings and the medical record, and was generally consistent with the standing, walking, sitting, and manipulative findings of the state agency medical consultants. AR 38. Notwithstanding the significant weight he accorded Dr. Gable's opinion, the ALJ explained that he assigned slightly greater functional limitations to account for new imaging studies of Plaintiff's knees that were provided after the ALJ's hearing and also to give the benefit of the doubt to Plaintiff's subjective complaints. AR 38.

The ALJ next addressed the various medical opinions of Plaintiff's treating physician, Dr. Cuan. He assigned little weight to her opinions of October 28, 2014 and October 30, 2014 in which she opined that Plaintiff was disabled. AR 38. To support her opinions, Dr. Cuan

explained that Plaintiff's cervicalgia, osteoarthritis of the knees, back and neck pain, and carpal tunnel contributed to his disability. AR 38. The ALJ explained that he gave these opinions little weight because they were not based on a treating relationship at that time but were based on a single evaluation of Plaintiff, appeared overly reliant on Plaintiff's subjective complaints, and were inconsistent with her treatment notes and observations. AR 38.

The ALJ also assigned limited weight to Dr. Cuan's medical source statement of November 6, 2015. AR 39. Dr. Cuan's statement explained that Plaintiff had chronic neck, low back, and knee pain, chronic obstructive pulmonary disease, carpel tunnel syndrome, obstructive sleep apnea, and diabetes. AR 39. She assigned the following functional limitations: could only walk one city block without rest or pain; could stand, walk, or sit for less than two hours in an eight hour day; must be able to shift positions at will while seated; would need to take five to six unscheduled work breaks in an eight hour day of thirty minutes on average; could lift ten pounds occasionally and twenty pounds rarely; could never look down, rarely turn his head left or right, occasionally look up, and frequently hold his head in a static position; could rarely twist or climb stairs; could never stoop crouch, squat, or climb ladders; could only handle objects for two percent of an eight hour day bilaterally; could only perform fine manipulations bilaterally for two percent of an eight hour day; could only perform reaching maneuvers bilaterally for twenty percent of an eight hour day; would likely be absent from work more than four days per month; and that his pain and other symptoms would frequently interfere with his attention and concentration needed to perform even simple work tasks. AR 39. The ALJ stated that he assigned this opinion little weight because it is inconsistent with Dr. Cuan's treatment notes and her earlier statements. AR 39. For example, Dr. Cuan's treatment notes from October 28, 2014 stated that Plaintiff had a normal range of motion in his neck with no tenderness and, yet, in her November 6, 2015 assessment she stated that Plaintiff could not look down and could barely turn his head left or right. AR 39. The ALJ also pointed out that during her October 28, 2014 examination of Plaintiff Dr. Cuan noted that he had no significant deficiencies in concentration, persistence, or pace, but in her November 6, 2016 opinion she opined that Plaintiff had significant concentration and attention limitations. AR 39. He further concluded that Dr. Cuan's severe manipulative and postural

limitations were not supported by any objective medical evidence and were inconsistent with Plaintiff's ability to prepare his own meals, use public transportation, stay with friends for shelter, his homelessness, his ability to spend most of his days outside, and his stated goal to make enough money to join the YMCA and start exercising. AR 39-40.

The ALJ also reviewed the psychological evaluations of Plaintiff. He assigned substantial weight to the opinions of Dr. Paxton, who performed a psychiatric medical consultation based on Plaintiff's medical records on October 9, 2014. AR 40. Dr. Paxton opined that Plaintiff had moderate limitations in his ability to carry out detailed instructions and moderate limitations in his ability to interact appropriately with the public. AR 40. Therefore, Dr. Paxton limited Plaintiff to non-public, simple and repetitive tasks. AR 40. Likewise, the ALJ assigned significant weight to the opinions of state agency psychological medical consultant Dr. Patterson who found that Plaintiff was limited to non-public work involving simple and repetitive tasks. AR 40. The ALJ explained that the opinions of Drs. Paxton and Patterson were consistent with the medical records and Plaintiff's subjective complaints. AR 40. The ALJ found that Plaintiff's reported activities of daily living only supported a limitation of occasional interaction with coworkers, supervisors, and the public, rather than limiting all interaction. AR 40.

Finally, the ALJ assigned partial weight to the opinions of Dr. Chaffee, who performed a psychological consultative examination of Plaintiff on August 6, 2014. AR 40-41. Dr. Chaffee diagnosed Plaintiff with bipolar disorder, current episode depressed; dyslexia; and polysubstance dependence, in full-sustained remission. AR 41. Dr. Chaffee concluded that Plaintiff had the following impairments: moderate impairment to follow and remember complex or detailed instructions; moderate impairment to maintain adequate pace and persistence to perform one-to-two-step simple, repetitive tasks; marked impairment to maintain adequate pace or persistence to perform complex tasks; marked impairment to maintain adequate attention and concentration; marked impairment to adapt to changes in a job routine and perform consistently; moderate impairment to withstand the stress of a routine workday; severe impairment to maintain emotional stability and predictability; marked impairment to maintain regular attendance in the workplace and communicate effectively; and moderate impairment to interact appropriate with coworkers

and the public. AR 41. Dr. Chaffee found no impairment in his ability to follow and remember simple instructions, accept instructions from his supervisors, and perform work activities without special instruction or supervision. AR 41.

In assigning these opinions partial weight, the ALJ gave substantial weight to Dr. Chaffee's findings that he had no impairment in his ability to follow and remember simple instructions, moderate impairment in his ability to interact appropriate with coworkers and the public, no impairment in his ability to accept instructions from supervisors, and no impairment in his ability to perform work activities without special instructions or supervision. AR 41-42. The ALJ reasoned that these findings were based on personal observation and are generally consistent with the findings of the state agency psychiatric and psychological medical consultants and also consistent with Plaintiff's reported activities of daily living. AR 42. However, the ALJ assigned little weight to the remaining limitations noted in Dr. Chaffee's opinion, finding that they were inconsistent with Plaintiff's reports that he reads magazines, watches television, and socializes with others at the library. AR 42. Moreover, the ALJ found that the remaining opinions were inconsistent with other doctors' treatment notes that he was pleasant and cooperative with a normal mood and affect, as well as Plaintiff's ability to answer questions asked of him at the hearing before the ALJ without needing to have questions repeated. AR 42.

As to Plaintiff's subjective statements about the symptoms he experienced, the ALJ concluded that Plaintiff's impairments could reasonably be expected to cause the alleged symptoms but that his complaints about their intensity, persistence, and limiting effect was not entirely credible. AR 42-43. First, the ALJ discounted Plaintiff's complaints due to his described activities of daily living, which he concluded were not as limited as one would expect. AR 42. The ALJ described how Plaintiff reported that he generally woke up around dawn and made himself coffee and is always outside and uses public transportation to travel. AR 42. He remarked that Plaintiff shops for himself in grocery stores, makes his own meals, and stores his food at a friend's house because he is homeless. AR 42. He noted that Plaintiff visits the library where he socializes with others and is able to pay bills, count change, and manage a bank account. AR 42. Plaintiff is also able to find friends who will allow him to stay at their homes temporarily.

AR 42. In summary, the ALJ found that these activities of daily living were inconsistent with Plaintiff's reports that he can hardly walk, cannot do any activities, is unable to lift, and does not spend time with others. AR 42.

The ALJ provided several others reasons for negatively evaluating Plaintiff's credibility. He also explained that evidence in the record indicates that Plaintiff stopped working for reasons that were unrelated to his allegedly disabling impairments. AR 42. Specifically, evidence shows that he was laid off on January 15, 2004, and he later explained to his examining psychologist that companies were closing down after September 11, 2001, and he spent his days drinking and taking illicit drugs. AR 42. The ALJ also pointed to Plaintiff's noncompliance with medical advice to quit smoking, lose weight, and exercise, as reflecting the possibility that his impairments may not have been as severe as alleged. AR 42-43. The ALJ also described as a double-edged sword the fact that Plaintiff has been prescribed and taken appropriate medications that have been relatively effective in controlling his symptoms. AR 43. Although the ALJ acknowledged that his use of appropriate prescriptions tended to weigh toward establishing Plaintiff's alleged impairments, their relative success at ameliorating his symptoms also indicated that Plaintiff's alleged symptoms may be exaggerated. AR 43. Furthermore, the ALJ found that Plaintiff was not entirely credible based on his testimony at the hearing, which he described as "generally unpersuasive." AR 43.

Finally, the ALJ also discounted the third party statement of Plaintiff's friend, Felicia Webb, assigned them little weight, and concluded that they did not support Plaintiff's alleged symptoms and overall disability. AR 43. He found that her observations about Plaintiff's impaired mental health and inability to stand for any length of time were inconsistent with the preponderance of the medical opinions. AR 43. Moreover, the ALJ concluded that she could not be considered a disinterested observer by virtue of her friendship with Plaintiff, which meant that her observations likely reflected Plaintiff's embellished complaints. AR 43.

Based on the ALJ's RFC assessment, the ALJ concluded that Plaintiff is unable to perform any of his past relevant work. AR 43-44. In coming to this conclusion, the ALJ relied on the vocational expert's testimony that a hypothetical person with Plaintiff's RFC would not be able to

perform his previous work of a carpenter, DOT listing 860.381-022 (medium work and SVP 7), electrician, DOT listing 824.261-010 (medium work and SVP 7), and semi-skilled construction worker, DOT listing 869.664-014 (heavy work and SVP 4), all of which Plaintiff performed at the heavy exertional level or greater.  AR 43.

### 5. Step Five -- Adjustment to Another Job in the National Economy

Having found that Plaintiff could not perform his prior relevant work, the ALJ moved on to step five of the sequential evaluation to determine whether Plaintiff could make an adjustment to another job in the national economy given his age, education, work experience, and residual functional capacity.  AR 44-45.  The ALJ found that Plaintiff was forty-nine years old on the date of his application and subsequently changed age category to closely approaching advanced age.  AR 44.  He found that Plaintiff had a limited education and is able to communicate in English.  AR 44.

Based on the Medical-Vocational Rules, the ALJ concluded that Plaintiff was not disabled because he can perform light work with some additional limitations, whether or not Plaintiff has transferable job skills, and there is other work that exists in significant numbers in the national economy that Plaintiff can perform with his additional limitations.  AR 44.  He relied on the vocational expert's testimony that Plaintiff would be able to perform the job duties of a light level production assembler (DOT listing 706.687-010, light work at SVP 2), small products II assembler (DOT listing 739.687-030, light work at SVP 2), bench assembler (DOT listing 706.684-022, light work at SVP 2), parking lot attendant (DOT listing 915.473-010, light work at SVP 2), and cashier II (DOT listing 211.462-010, light work at SVP 2).  AR 45.

## II. LEGAL STANDARD

This Court has the authority to review the Commissioner's decision to deny benefits.  42 U.S.C. § 405(g); see Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).  The Commissioner's findings may be set aside if they are based on legal error or are not supported by substantial evidence.  See Reddick, 157 F.3d at 720.  Substantial evidence is defined as relevant evidence that a reasonable person might accept as adequate in support of a conclusion; it is "more than a mere scintilla but less than a preponderance."  Id.; see also Richardson v. Perales, 402 U.S. 389, 401

(1971); <u>Sandgathe v. Chater</u>, 108 F.3d 978, 980 (9th Cir. 1997).  Reasoning not relied upon by the ALJ cannot be relied upon to affirm the ALJ's decision.  <u>See</u> <u>Cequerra v. Sec'y</u>, 933 F.2d 735, 738 (9th Cir. 1991).

To determine whether the ALJ's decision is supported by substantial evidence, courts review the administrative record as a whole, weighing both the evidence that supports and detracts from the ALJ's decision.  <u>See</u> <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995).  If the evidence is susceptible to more than one rational interpretation, the Court must uphold the ALJ's conclusion.  <u>Id.</u> at 1030-40.  The trier of fact, not the reviewing court, must resolve conflicting evidence, and if the evidence can support either outcome, the reviewing court may not substitute its judgment for the judgment of the ALJ.  <u>See</u> <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005); <u>see also</u> <u>Matney v. Sullivan</u>, 981 F.2d 1016, 1019 (9th Cir. 1992).  An ALJ's decision will not be reversed for harmless error.  <u>Id.</u>; <u>see also</u> <u>Curry v. Sullivan</u>, 925 F.2d 1127, 1131 (9th Cir. 1991).

A.      **Definition of Disability**

In order to qualify for disability insurance benefits, a plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Administration ("SSA") utilizes a five-step sequential evaluation process in making a determination of disability.  20 C.F.R. § 404.1520; <u>see</u> <u>Reddick</u>, 157 F.3d at 721.  If the SSA finds that the claimant is either disabled or not disabled at a step, then the SSA makes the determination and does not go on to the next step; if the determination cannot be made, then the SSA moves on to the next step.  <u>See</u> 20 C.F.R. § 404.1520.

B.      **Determination of Disability**

First, the SSA looks to the claimant's work activity, if any; if the claimant is engaging in substantial gainful activity, she is not disabled.  <u>See</u> 20 C.F.R. § 404.1520(a)(4)(I).  Second, the SSA considers the severity of impairments; the claimant must show that he has a severe medically determinable physical or mental impairment (or combination of severe impairments) which has

which has lasted or is expected to last twelve months or end in death. See 20 C.F.R. § 404.1520(a)(4)(ii). Third, the SSA considers whether a claimant's impairments meet or equal a listing in 20 C.F.R. Part 404 Appendix 1. If so, the claimant is deemed disabled. See 20 C.F.R. § 404.1520(a)(4)(iii). Fourth, the SSA considers the claimant's residual functional capacity ("RFC") and past relevant work. If the claimant can still engage in past relevant work, he is not disabled. See 20 C.F.R. § 404.1520(a)(4)(iv). Fifth, the SSA considers whether, in light of the claimant's RFC and age, education, and work experience, the claimant is able to make an adjustment to another occupation in the national economy; if so, the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 404.1560(c).

The claimant bears the burden on steps one through four. See Reddick, 157 F.3d at 721. If a claimant establishes an inability to perform her prior work at step four, the burden shifts to the SSA to show that the claimant can perform other substantial work that exists in the national economy at step five. Id.

## III. DISCUSSION

### A. Whether the ALJ Erred in Assigning Weight to the Medical Opinions

Plaintiff contends that the ALJ erred in assigning little to no weight to the findings of Plaintiff's treating medical doctors without providing the appropriate reasons for doing so. The Ninth Circuit employs a hierarchy with respect to the weight that the ALJ is to give medical opinions. Specifically, it "distinguishes among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Id. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." Ryan v. Comm'r of Soc. Sec. Admin, 528 F.3d 1194, 1198 (9th Cir. 2008). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Id. Under

the applicable regulations, the ALJ is directed to consider the nature of the relationship (examining versus treating), the length of the treatment relationship and the frequency of examination, the extent of the examinations, the amount of relevant evidence given to support an opinion, consistency, specialization, and any other relevant factors when deciding how much weight to give a particular medical opinion. See 20 C.F.R. § 416.927(c)(1)-(6).

Because there is contrary evidence in the record about Plaintiff's physical and mental limitations from Dr. Gable and the state agency's consulting physicians, the "specific and legitimate reasons" standard applies to the ALJ's decision to reject all or some of the opinions of Dr. Cuan and Dr. Chaffee, respectively.

### 1. Dr. Cuan

Dr. Cuan provided a medical opinion dated November 6, 2016 that Plaintiff was seriously limited in his ability to work. The ALJ stated that he gave her opinion little weight because he concluded that Dr. Cuan's opinion was inconsistent with her treatment notes and earlier statements, and her severe manipulative and postural limitations were not supported by any objective medical evidence and were inconsistent with Plaintiff's ability to prepare his own meals, use public transportation, stay with friends for shelter, his homelessness, his ability to spend most of his days outside, and his stated goal to make enough money to join the YMCA and start exercising.

Plaintiff argues that these reasons are insufficient to reject her opinions as his treating doctor. First, Plaintiff contends that there is nothing in Dr. Cuan's treatment notes that indicates an ability to perform activities in excess of the functional capacity stated in her opinion. The ALJ only specifically raised two purported inconsistencies -- that her notes from her first examination of Plaintiff did not note any significant deficiencies in concentration, persistence or pace and that he had a normal range of motion of the neck with no tenderness -- whereas her RFC assessment stated that he could not look down and could barely turn his head left or right and had significant concentration and attention limitations. These inconsistencies are not enough to reject her opinions about his limitations because those examination notes were only based on Dr. Cuan's first examination of Plaintiff when he was being seen for back pain and subsequently she had a

1    year to observe him further before rendering her November 6, 2015 opinion.  Although her

2    treatments notes also stated that Plaintiff was alert and oriented with normal speech (AR 473), and

3    he was oriented to person, place, and time, and active and cooperative with normal mood and

4    affect (AR 491-92, AR 506-09), these brief impressions of Plaintiff's mental status, typically

5    taken without conducting a thorough psychological examination, are not substantial evidence

6    justifying the disregard of a treating physician's opinions.

7        Plaintiff also takes issue with the ALJ's reliance on his activities of daily living as grounds

8    for not giving full weight to Dr. Cuan's opinions.  The ALJ explained that his homelessness,

9    ability to take public transportation, microwave meals, and "couch surf" at a friend's apartment

10   were incompatible with Dr. Cuan's assessed manipulative and postural limitations.  He also

11   pointed to Plaintiff's stated desire to join the YMCA in order to exercise more frequently as

12   evidence of conflicting activities of daily living.  These reported activities, except for Plaintiff's

13   homelessness and ability to locate friends who will allow him to stay temporarily at their homes

14   and unfulfilled aspiration to exercise, do support the ALJ's conclusion to discount Dr. Cuan's

15   extremely restrictive manipulative and postural.  Dr. Cuan opined that Plaintiff could never bend

16   or look down, only rarely turn his head, and only use his hands or fingers for two percent of an

17   eight hour work day, but at least some of these reported activities of daily living suggest at least

18   some more functioning.

19       While the ALJ adequately supported his decision to give limited weight to some of Dr.

20   Cuan's contradicted medical opinions with "specific and legitimate reasons," he did not do so for

21   her other opinions.  Specifically, the ALJ did not provide any other basis for rejecting her opinions

22   about Plaintiff's ability to tolerate work stress because his pain affected his mood, his inability to

23   sit, stand, or walk for long periods, his need to shift positions at will, and his need to take frequent

24   breaks, even though those opinions are not contradicted by her treatment notes.  Neither the ALJ

25   nor Defendant has pointed to any evidence that contradicts her opinions on these issues, aside

26   from the contrary opinions of the nonexamining physicians.  The ALJ's failure to adequately

27   account for the rejection of these opinions is especially problematic with respect to Dr. Cuan's

28   opinion that Plaintiff is sharply limited in his ability to sit, stand, or walk for a long period of time,

which would likely preclude him from light work as called for in the ALJ's RFC assessment. There is considerable evidence in the record, including Plaintiff's subjective complaints about pain as well as ongoing medical records showing treatment for long-term, serious joint pain and his morbid obesity, that seriously call into question whether substantial evidence supports rejecting these opinions. Accordingly, the ALJ erred in giving little weight to a number of Dr. Cuan's opinions regarding Plaintiff's restrictions as a treating physician because he did not provide specific and legitimate reasons for doing so.

### 2. Dr. Chaffee

Plaintiff argues that the ALJ erred by only giving weight to some of the opinions of Dr. Chaffee who performed a consultative neuro-psychological examination. In assigning only partial weight to her opinions, the ALJ gave substantial weight to Dr. Chaffee's finding that Plaintiff had no impairment in his ability to follow and remember simple instructions, moderate impairment in his ability to interact appropriately with coworkers and the public, no impairment in his ability to accept instructions from supervisors, and no impairment in his ability to perform work activities without special instructions or supervision. AR 41-42. The ALJ reasoned that these findings were based on Dr. Chaffee's personal observation, were generally consistent with the findings of the state agency psychiatric and psychological medical consultants, and were also consistent with Plaintiff's reported activities of daily living. AR 42. However, the ALJ assigned little weight to the remaining limitations noted in Dr. Chaffee's opinion, finding that they were inconsistent with Plaintiff's reports that he reads magazines, watches television, and socializes with others at the library. AR 42. Moreover, the ALJ found that they were inconsistent with treatment notes that he was pleasant and cooperative with a normal mood and affect, as well as Plaintiff's ability to answer questions at the hearing before the ALJ without needing to have questions repeated to him. AR 42.

In his motion, Plaintiff focuses on the ALJ's decision to give limited weight to Dr. Chaffee's opinions that he was markedly impaired in his ability to maintain adequate attention and concentration, adapt to changes in a job routine and perform consistently, and maintain regular attendance in the workplace. These marked, as opposed to severe, limitations are not incompatible

1  with the activities of daily living that the ALJ specifically referenced in rejecting Dr. Chaffee's

2  opinions (i.e., reading a magazine, watching a television program) or answering personal questions

3  during the ALJ hearing for approximately thirty minutes.  Moreover, the activities identified by

4  the ALJ are not relevant to Dr. Chaffee's opinion about Plaintiff's ability to adapt to changes in

5  routine or maintain attendance at work.  These marked limitations as to attention and

6  concentration are not inconsistent with Plaintiff's activities of daily living or his conduct at the

7  hearing and, thus, the ALJ's reason for discounting them was not legitimate.

8      The ALJ's decision to give substantial weight to several of Dr. Chaffee's proffered

9  limitations because, in part, they were based on Dr. Chaffee's personal observations but not give

10  weight to her other opinions on that same ground is not supported.  There is no reason to conclude

11  that her personal observations did not inform the rest of her opinions, as her conclusions were

12  based on a thorough evaluation and testing.  This is also relevant to Plaintiff's critique that the

13  ALJ discredited some of Dr. Chaffee's opinions, including her opinion that he was severely

14  impaired in his ability to maintain emotional stability and predictability, because her opinions

15  were inconsistent with other doctor's treatment notes that he was pleasant and cooperative.

16  Discounting her opinions on this basis is inconsistent with accepting Dr. Chaffee's opinion that

17  Plaintiff was moderately impaired in his ability to interact with coworkers, supervisors, and the

18  public and the fact that Dr. Chaffee spent much more time evaluating Plaintiff's mental state as

19  compared to short visits with doctors at the local health clinic.  As discussed above with respect to

20  Dr. Cuan's opinions, brief mental status exams alone are not substantial evidence.  However, Dr.

21  Chaffee's proffered limitations about Plaintiff's emotional stability and predictability were

22  inconsistent with numerous treatment notes that he was pleasant, active, and cooperative (e.g., AR

23  411, 433, 492, 508-09) from other doctors who saw and treated him more frequently and the

24  ALJ's own observations of Plaintiff's demeanor at the hearing.  There is also no indication in the

25  record that Plaintiff ever sought treatment for his psychological condition.  Dr. Chaffee's

26  assessment that Plaintiff is more dramatically limited in his ability to maintain emotional stability

27  and predictability is not supported by the entire medical record.

28      On the whole, the ALJ properly supported his decision to discount some of the opinions in

Dr. Chaffee's report but did not support his decision to discount the marked limitations as to concentration, attention, consistent performance, and regular attendance in the workplace. Thus, the weight he gave to some of her opinions was in error.

### B.  Whether the ALJ Erred in Assessing Plaintiff's Credibility

In order to find a claimant's testimony regarding symptoms unreliable, the ALJ is "required to make 'a credibility determination with findings sufficiently specific to permit the courts to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002)).  The Ninth Circuit requires the ALJ to conduct a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  See Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007)) (internal citations omitted).

If the claimant has presented evidence to satisfy the first step, "and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear, and convincing reasons for doing so.'" Garrison, 759 F.3d at 1014-15 (quoting Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996)).  "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995) (citing Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993); Varney v. Secretary of Health & Human Servs., 846 F.2d 581, 584 (9th Cir. 1988)).  The ALJ may consider many factors when weighing the claimant's credibility, including "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).  "This is not an easy requirement to meet: 'The clear and convincing standard is the most

1    demanding required in Social Security cases.'" <u>Garrison</u>, 759 F.3d at 1015 (quoting <u>Moore v.</u>

2    <u>Comm'r of Soc. Sec. Admin</u>, 278 F.3d 920, 924 (9th Cir. 2002)).

3         Here, the ALJ made a general statement that Plaintiff's conditions could cause his

4    symptoms but that his "statements concerning the intensity, persistence and limiting effects" were

5    not entirely credible.  AR 42.  As a threshold matter, this generic statement does not meet the

6    requirement from <u>Lester</u> that the ALJ must specifically identify which testimony he does not find

7    credible.  Plaintiff's disability applications and his hearing testimony alleged many types of

8    symptoms, including sleep apnea, carpal tunnel syndrome, and joint pain.  Based on the ALJ's

9    blanket statement that he did not find Plaintiff's complaints credible, it is impossible for the Court

10   to determine which complaints the ALJ found to be lacking in credibility and compare them

11   against the reasons he gave for doing so.

12        Moreover, the ALJ did not provide "clear and convincing" reasons for discounting any of

13   his complaints.  The ALJ explained that he did not find Plaintiff's statements about the intensity,

14   persistence, and limiting effects of his symptoms entirely credible because he found that they were

15   incompatible with his homelessness and reported activities of daily living, there was evidence that

16   he stopped working prior to the onset of his disability for unrelated reasons, he had difficulty

17   quitting smoking, he was non-compliant with doctors' orders to lose weight and exercise, and his

18   medications had been relatively effective in controlling his symptoms.  In addition, although the

19   ALJ expressly stated that it was not a determining factor in his credibility assessment, he

20   concluded that Plaintiff's testimony at the hearing was not persuasive about the severity of his

21   symptoms.

22        Taking the issue of Plaintiff's homelessness first, it is not readily apparent how his lack of

23   permanent shelter or his ability to sometimes find a friend who will allow him to sleep temporarily

24   on his or her sofa undermines Plaintiff's representations about his symptoms, and the ALJ did not

25   elaborate on this basis for his negative credibility determination.  To the contrary, other aspects of

26   Plaintiff's testimony, such as his statements that he uses a cane to walk and a motorized cart while

27   grocery shopping, support these complaints, as do his statements that he spends the day trying to

28   find places to sit and lay down and can only stand long enough to prepare microwaved meals.

Moreover, his statements that he wakes up at dawn and makes coffee when he is staying with a friend are not substantial evidence that he is capable of work or a convincing reason to discount Plaintiff's testimony. While the inability to make coffee would likely be convincing evidence that a person has severe symptoms, the ability to make coffee does not lead to the opposite conclusion that a person does not suffer severe symptoms. The ALJ did not explain how waking up at dawn is inconsistent with his alleged symptoms, including those relating to Plaintiff's sleep apnea, and waking up at dawn might very well be linked to Plaintiff's homelessness, in that the rhythms of his sleep are dictated by the natural cycles of the day. As to Plaintiff's reported activities of daily living, the ALJ also noted that a third party reported that Plaintiff spends most of his time outside as evidence that he is not disabled, but this is generally an inherent condition of homelessness.

The fact that Plaintiff may have stopped working initially for reasons that are unrelated to his alleged disability is not a clear and convincing reason to discount his symptoms under these circumstances. Plaintiff's medical issues, particularly the pain he experiences in his back, knees, and neck, are degenerative in nature, as confirmed by the X-rays in the medical record. Under these circumstances, one would expect that Plaintiff's condition would worsen over time, even if these degenerative conditions were not the reason he initially stopped working or did not immediately find work after being laid off in 2004. While he might well not have been disabled when he first stopped working, he may well have been so thereafter. Defendant cited two cases that held that an ALJ properly considered that a claimant was out of work for reasons unrelated to his alleged disabilities (Bruton v. Massanari, 268 F.3d 824, 828 (9th Cir. 2001) and Macri v. Chater, 93 F.3d 540, 544 (9th Cir. 1996)), but those cases are inopposite because there is no reason to conclude that the reasons that led to Plaintiff's unemployment in 2004 (a layoff resulting from the slowdown in the economy after the September 11, 2011 terrorist attacks and his drug and alcohol use) are still the same reasons that Plaintiff is unemployed today. Furthermore, in Bruton, the court affirmed the ALJ's negative credibility finding for the specific reason that the claimant lied about why he left his job when there was direct evidence that contradicted his allegation that he left because of an injury. See Bruton, 268 F.3d at 828.

With respect to the ALJ's finding that Plaintiff's credibility was undermined by his

noncompliance with doctors' recommendations that he stop smoking and lose weight, these are similarly unconvincing reasons for discounting Plaintiff's subjective complaints. Cigarettes are well known to be addictive and it is difficult to quit smoking, regardless of an individual's physical or mental condition. His struggle to lose weight is a universal problem, and Plaintiff's difficulty in losing weight could well be exacerbated by his homelessness, and physical impairments, including joint pain. Moreover, he testified that he mostly consumed highly-processed foods that he could prepare quickly in the microwave because of his low budget, inability to stand to cook for long periods of time, and lack of consistent access to a kitchen or place to store his food. Finally, there is other evidence in the record that Plaintiff lacked some or all of his teeth, which made eating fresh vegetables difficult. Finally, Plaintiff testified that after his recent diabetes diagnosis he changed his diet and has begun losing weight.

The ALJ's discussion of the relative effectiveness of Plaintiff's medications to control his symptoms based on several statements in the medical record was not clear and convincing. In one statement from 2010, Dr. Gunasekera noted that Plaintiff's knee pain was relieved by pain medication. However, several sentences later, Dr. Gunasekera noted that Plaintiff was no longer responding to the pain medication Voltaren and he indicated an interest in receiving cortisone shots for his knee. AR 436. Plaintiff then received the requested injections in 2010 and 2011, but eventually discontinued using them because he experienced unpleasant side effects. The ALJ also referenced two statements from October 2014 in which Plaintiff reported that Relafen and Norco helped in relieving his joint pain and that Nabumetone "work[ed] really well for his chronic knee pain." AR 470, 475. However, at the same time that Plaintiff stated that Nabumetone worked well, he also reported that the Norco was no longer working and requested a prescription for Percocet. AR 475. Approximately nine months later, he returned to his physician with ongoing joint pain and asked to have his pain medications changed once again because the Percocet was no longer working either. AR 499. Therefore, the ALJ's isolation of a few specific instances where certain of Plaintiff's medications helped ease his pain symptoms is not a clear and convincing reason to discredit his subjective reports of pain.

Finally, the ALJ remarked that he found Plaintiff's testimony "generally unpersuasive,"

29

noting that this was just one factor he took into account in assessing Plaintiff's credibility. AR 43. This conclusory statement about the ALJ's overall appraisal of Plaintiff's hearing testimony provides a "complete lack of meaningful explanation . . . with which to assess its legitimacy." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 884 (9th Cir. 2006). The ALJ may base his credibility determination on "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid," Tommasetti v. Astrue, 533 F.3d at 1039, but he must provide "specific findings and reasoning" for doing so. Robbins, 446 F.3d at 884. Here, the ALJ failed to provide the necessary explanation for his finding that Plaintiff's testimony was unpersuasive, which prevents this Court from reviewing the adequacy of those reasons. Therefore, it does not qualify as a "clear and convincing" reason to discount Plaintiff's subjective complaints.

In conclusion, the ALJ erred in failing to support his negative credibility determination with clear and convincing reasons.

C.      **Whether the ALJ Erred in Developing the Record**

Plaintiff's final argument is that the ALJ should have obtained a current orthopedic examination or medical expert testimony for Plaintiff in order to fulfill his duty to fully develop the record. The ALJ has an "independent 'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) (quoting Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996)). "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'" Id. (quoting Smolen, 80 F.3d at 1288)). Options include "subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." Id. (citing Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998)).

At the conclusion of the ALJ's hearing, Plaintiff asked the ALJ to accept new images of his knees. AR 91. The ALJ accommodated that request, and Plaintiff submitted new X-rays of both knees on January 13, 2016. AR 697-98. At that time, Plaintiff also requested a supplemental

hearing with medical expert testimony in light of the new X-rays. AR 697. The ALJ rendered his unfavorable decision on January 28, 2016 without holding another hearing. In his opinion, the ALJ explained that he did not grant the request for a supplemental hearing because Plaintiff's request was untimely, having only been made for the first time months after the hearing and the new X-rays were cumulative of the 2013 X-rays that were already in the record.

Plaintiff argues that medical expert testimony was necessary to fulfill the ALJ's duty to complete the record to take into account the most recent objective evidence about his degenerative knee condition, particularly because the other most recent images of his knees was from 2013 and the ALJ did not give full weight to the opinions of any of the treating or examining physicians.

Defendant contends that that the new X-rays from 2016 were duplicative of the earlier X-rays and, in fact, the radiologist noted that the "[d]egenerative change of the anterior compartment [was] better seen on old study of October 16, 2013." AR 698. That statement, however, was only applicable to one view of the X-ray for one knee. Moreover, the remaining notes in the 2016 X-rays were not duplicative of the 2013 X-rays, and noted marked degenerative changes, subluxation, and the suggestion of loose bodies. The 2013 X-rays merely showed moderate to severe osteoarthritis as evidenced by joint space narrowing, osteophyte formations, and subchondral sclerosis. AR 399.

The 2016 X-rays contain new information that suggests a deterioration of Plaintiff's knee condition over time, which is consistent with the medical records that show ongoing treatment of his worsening knee pain. The ALJ seems to have determined that the record did not need supplementing, even after reviewing these new records, because he gave great weight to medical opinions that had reviewed the 2013 X-rays. The 2016 X-rays appear on their face to be materially different than the 2013 X-rays. A medical expert's review of these new records in the context of the entire medical evidence could change the ALJ's determination and so failure to further develop the record in light of the new X-rays was not harmless error.

Defendant provides no support for the ALJ's conclusion that the request for a new hearing was untimely. However, to fulfill the ALJ's duty to fully develop the record, the ALJ does not necessarily need to hold a new hearing, although that is one way to complete the record and the

31

Court has no position on whether a supplemental hearing should be scheduled in this case. The ALJ will be in the best position to determine the appropriate way to obtain a medical specialist's opinion about the impact, if any, the 2016 X-rays have on Plaintiff's application.

### D. **Whether to Remand or Award Benefits**

"The decision whether to remand a case for additional evidence, or simply to award benefits[,] is within the discretion of the court." Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987). "'If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded'" for further proceedings. Garrison v. Colvin, 759 F.3d 995, 1019 (9th Cir. 2014) (quoting Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981)). However, a court may also reverse and remand with instructions to calculate and award benefits "when it is clear from the record that a claimant is entitled to benefits." Id.

The ALJ erred as to his credibility assessment of Plaintiff's subjective complaints, his rejection of some or all of the opinions of Drs. Cuan and Chaffee, and his failure to fully develop the record in light of the new X-rays provided by Plaintiff after the hearing. Evaluating credibility and resolving any outstanding inconsistencies in the record are "'exactly the sorts of issues that should be remanded to the agency for further proceedings.'" Brown-Hunter v. Colvin, 806 F.3d 487, 495 (9th Cir. 2015) (quoting Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1105 (9th Cir. 2014)). While Plaintiff testified about the debilitating nature of his disability and his treating and examining doctors' opinions, if credited, support his disability, there is also evidence, as the ALJ referenced, that some of his medication has adequately controlled his pain symptoms and the ALJ may determine that not all of the physicians' opinions of disabling limitations should be credited. "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate." Brown-Hunter v. Colvin, 806 F.3d at 496 (quoting Treichler, 775 F.3d at 1101). Moreover, the January 2016 X-rays that the ALJ reviewed after the hearing, suggest that the condition of Plaintiff's knees has further deteriorated, and may also go to the date of onset of disability, if any. The ALJ should obtain orthopedic medical expert evidence about the current state of Plaintiff's knees in light of the open credibility question and the unresolved factual issues that remain to be reviewed on remand. Accordingly,

the Court remands this case for further proceedings before an ALJ.

## IV.    CONCLUSION

For the reasons discussed above, the Court GRANTS Plaintiff's motion for summary judgment, DENIES Defendants motion for summary judgment, and REMANDS for further proceedings.

**IT IS SO ORDERED.**

Dated: May 11, 2018

ELIZABETH D. LAPORTE
United States Magistrate Judge